Good morning. May it please the Court. James Whitlock for Plaintiffs' Appellants Peggy Hill and Amy Walker. The District Court's decision must be overturned because the Court read the threshold requirement generally accepted out of the regulatory definition of harass under the Endangered Species Act. Had the Fish and Wildlife Service intended to create an exception to harassment based solely on compliance with the minimum standards of the Animal Welfare Act, the Service could have done so by simply omitting the phrase generally accepted. Who's going to decide what's generally accepted? Your Honor, I think the Fish and Wildlife Service has given some guidance in that regard when they amended the definition of harass to add this exception. But on a case-by-case basis, I believe that the Federal Courts will have to interpret this. I believe it's a standard of care. But this is a statute with a criminal aspect to it. You can go to prison for six months for violating this statute. And we're going to have the District Court decide a standard of care in retrospect as to whether this person goes to prison? Well, Your Honor, certainly under certain provisions of the Endangered Species Act, there are criminal aspects. That is certainly not what this case is about. Well, but we're going to interpret a statute here that carries a criminal penalty. And we're going to let some amorphous group decide whether the actions of some person are criminal or not? Well, Your Honor, I think that the Fish and Wildlife Service was clear. It added that language generally accepted for a reason. And that's because it did not intend for AWA compliance to be the sole determinant for whether or not husbandry practices are sufficient to come within this exception. And given that that language is there, this Court has the authority to, dating back to Marbury v. Madison, to quote-unquote say what the law is, to hear the evidence, and then apply the facts to a properly construed regulation. But a regulation? It's the Department of Agriculture that's going to decide what the regulation is. Well, it's the Fish and Wildlife Service. Well, yeah, a part of the Department of Agriculture. Right. Well, the Fish and Wildlife Service is under the Department of Interior. Okay. Yeah, right. It's confusing here because we have two separate statutory schemes. I'm sorry. Going back to just Judge Bailey's thought that it's really up to the agency to decide what the regulation means, this is not on you, but we don't have the views of the Fish and Wildlife Service in this case. We don't know what they think their own regulation means, do we? We do, Your Honor. How do we know? They didn't file a brief in this case, did they? Oh, no, they did not. I apologize. But the appellants did cite in their brief to the Federal Register notice. Oh, yeah, yeah, yeah, yeah, but it's not on you. But we don't have any indication beyond that of what FWS believes this regulation means. That's correct, Your Honor. That is the only regulatory history, you know, in 1998, when the service amended the definition of harass to add this exception. And, you know, when you look at that, though, it is clear the focus was on the generally accepted. The focus was not on the Animal Welfare Act. And given that that language is in there under fundamental canons of regulatory construction, it has to be given meaning. Well, it will have meaning, right, as applied to the second two items on this list of exceptions. Exactly. So it has meaning. There's a reason they couldn't just take generally accepted out. I agree, Your Honor. But why isn't the most sensible way to read this that as to the first item on the list, the first item on the list has enough specific language that it kind of explains what counts as generally accepted, just for that one item, and that what's generally accepted are standards that are good enough under the Animal Welfare Act? Well, Your Honor. I mean, wouldn't it make, just as a matter of common sense, going back to this reading, it just seems like it, tell me why it doesn't make sense to do it that way. Because, I mean, the Animal Welfare Act is all about, it is chiefly concerned, if I'm understanding this right, about ensuring humane treatment of captive animals. So it seems to make a certain amount of sense that when you're now under the Endangered Species Act, which does apply to captive animals, but that's not like exactly the main point, they might want to reference at this, in making an exception for captive animals and at general husbandry practices, why wouldn't they just look to the AWA? Why doesn't that make sense? Correct. And, Your Honor, I think it's because the purposes, the expressed purposes of the Endangered Species Act. Congress was explicit that they wanted the prohibition on tape to be interpreted very broadly, in the broadest manner possible. The Supreme Court has stated that on multiple occasions. And, in fact, to the point of stating that federal agencies shall carry out that purpose over and above their own primary purposes. And so the protections provided by the Endangered Species Act are additive, if you will, to those of the Animal Welfare Act. The Animal Welfare Act establishes minimum standards. They are the floor of animal husbandry. And when the Fish and Wildlife Service adopted this exception, what it stated was, the purpose of amending is to exclude proper animal husbandry practices from the prohibition on tape. However, it was clear that the prohibition on tape still applied to improper animal husbandry practices. The service said, since captive animals can be subjected to improper husbandry, as well as to harm and other taking activities, such protections take will be maintained consistent with congressional intent. And, Your Honor, quite frankly, I think if this regulation still, after this definition was added, has any exception or has any application as to captive animals, it's this case. These grizzly bears, these threatened grizzly bears, these enormous animals, the Cherokee Bear Zoo confines them to two concrete pits where they have nothing to do but pace around, which is an abnormal and stereotypic behavior. They're provided no environmental enrichment by the Cherokee Bear Zoo to stimulate natural behaviors. And, in fact, the only real thing that they are allowed to do, for lack of a better word, is they're subjected to public feedings, again, which encourages them to beg for food, an abnormal behavior. And there's nothing you can do about that under the Animal Welfare Act because there's no citizen supervision? Is that what's going on here? That's correct. There's no citizen supervision under the Animal Welfare Act. And if the USDA or the APHIS is going to come in and witness this and say, this is fine, then, again, there has to be the understanding that the Endangered Species Act still applies over and beyond that. And, in fact, that's what the service recognized when they enacted this exception. They said, you know, basically, well, we understand these exhibitors cannot possess these animals without harassing them. Mere possession, essentially, is harassment. And so they added this exception. And, Your Honor, back to your point on the three subsections. What it says is this exception does not include generally accepted, colon, and then the three subsections. Generally accepted modifies all three. If you read it out, like the district court judge did in this case, and say we're applying it to subsection 2, breeding procedures, it would say, it would then read this definition when applied to captive wildlife does not apply to breeding procedures. That makes no sense. That generally accepted has to be given meaning. You know, I didn't understand the district court to be saying, and it's certainly not the reading I'm proposing, that you read it out. It's that it takes its meaning, it gets its meaning from the specific words of subsection 1. It's not being read out. We are defining generally accepted to mean consistent with the AWA. Well, Your Honor, I don't recall the district court order saying that. The district court, quite frankly, just didn't give any meaning to generally accepted. Okay, I'm suggesting then that it gets its meaning from the specific language in subsection 1. And for purposes of subsection 1, what it means is consistent with the AWA. I understand, Your Honor. I'm just not sure that that is consistent not only, as I stated, with the fundamental canons of regulatory construction, but also with the intent of the Fish and Wildlife Service when they added this exception. Are there any cases adopting your reading of the exception? Excuse me? Is there any case law that adopts the reading you're advancing here? Your Honor, there are two other cases right now that are currently on appeal, but none that have really gone and delved into the construction of this exception as we are today. This is really an issue of first impression for a circuit court of appeals. It will be taken up by two other courts subsequent to this. And essentially what it's resulting in is defendants, like the Cherokee Bear Zoo in this case, simply walking into court with their USDA exhibitor license and saying, you know, we can't take animals under the Endangered Species Act. We have a license. And that is an absurd result. It was never intended. And as I said, the service was clear to distinguish between proper and improper husbandry. And all the evidence in this case, plaintiff's expert testimony was unrebutted, that the Cherokee Bear Zoo's husbandry practices are not generally accepted. And the court found that. In fact, the defendant's expert admitted that these bear, modern standards require that these bears should be in a more natural habitat with more space. The court, in its conclusion, in its order, stated the pits are now generally considered archaic and that modern zoological practices require more natural environments. How do you justify your argument with 7 United States Code 2143, which says the secretary and its secretary of agriculture shall promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors, and that the standards described in paragraph 1, that is, the secretary's standards, shall include minimum requirements for handling, housing, feeding, watering, sanitation, ventilation, shelter from extremes of weather and temperature, adequate veterinary care, and separation of species, et cetera? Yes, Your Honor, and that is, I'm familiar with that provision of the Animal Welfare Act, and that is where the secretary is directed to promulgate the minimum standards which are referenced in this captive wildlife exception. It is appellant's contention that because of the broad expanse of the Endangered Species Act prohibition on take and consistent with the legislative intent behind that, it applies over and beyond those minimum standards. Simply complying with those minimum standards in and of itself is not enough. Is there any statute that says that? Your Honor, I would have to look, but I know, as I stated before, that I believe it's in the TVAV Hill case, the snail darter case, where the court actually stopped the construction of the Teleco Dam because it was going to hurt the endangered snail darter. The court says the Endangered Species Act takes precedence over the primary missions of other federal agencies. That wasn't a captive. Excuse me? It was not a captive animal. It was not a captive animal, but the Endangered Species Act applies equally to both. Once a species is listed, the act applies equally to that species in the wild and those held in captivity. All right. Thank you, sir. Thank you. Mr. Melrose. May it please the Court? My name is Mark Melrose. I represent the defendants in this matter. I don't think that, as interesting as the statutory construction argument is, I really don't think this Court ought to reach that issue because of the question of the lack of standing. I think should this Court find standing in this case on behalf of these two individual plaintiffs, this Court would really be sticking its neck out in Article III jurisprudence. There's no case that I'm aware of where facts even remotely similar to the case at Barr would be sufficient to confer Article III standing on this case. These two women made a solitary visit. One of the plaintiffs only spent 20 minutes observing these bears. The other one, 30 minutes. And this was only after a failed political attempt to shut down the bear zoo. Following that solitary visit, they made identical claims in this litigation that, ironically, matched up with Supreme Court precedent with regard to- Counsel, the district court found them to be credible, accepted what they said. So the fact that you don't believe them and you think they're political operatives or something, I just don't see. We can't get behind the district court's credibility findings here. I agree with respect to the credibility findings. However, I think as a matter of law, a solitary visit lasting no more than 30 minutes is- I think that as a matter of law, it's impossible to confer standing to find, as a matter of law, that that could result in the type of psychological aesthetic attachment to these animals. But the district court said it did, that they had the kind of attachment that is required for standing. How am I supposed to conclude that they didn't? Your Honor, because I think as looking at what this is unsupported by the facts, that you could form an intense psychological attachment to animals based on a 20-minute visit. Well, I think it- But there was a finding also that because of their membership in this tribe, they started out with a cultural and spiritual attachment to bears. And the district court credited that and then credited the visit and the effect of the visit on these plaintiffs. And, I mean, this just seems like a fight over the facts and whether these are good faith plaintiffs or not. But I don't see how we get into that. Well, Your Honor, I just think that looking at what is before the court, that I think as a matter- I don't know how short a period of time could possibly lead to a credible Article III standing to visit bears after a failed political attempt to shut down the very place that they went to visit. So I understand what the court found. I don't think it's supported by the facts. And if you look at the Feld case, the elephant trainer, that- and I understand there were different facts at play in that, but that gentleman had over two years of contact with the elephants, et cetera. But the court found he was a paid plaintiff and did not sincerely hold those opinions. Yes, sir. And in this case, these plaintiffs, I would contend, based on the evidence that was presented at trial, they didn't know who was funding this litigation. But that's a factual issue that the district court has made. I understand. I'm just saying that there is no case that holds a single solitary visit would be sufficient to confer aesthetic harm to an individual plaintiff sufficient to confer Article III standing. I'm not saying that the district court found that as a fact, that that's what they had. I'm saying as a matter of law, that is unsupported by the facts in the case, that that simply cannot be enough to confer standing. If it is, then I would contend that it would lead to an outpouring of litigation by anybody who wanted to visit any zoo who was offended internally, personal taste, by what they saw, and suddenly there's Article III standing. And I don't think that should be sufficient. I don't think it is sufficient. Justice Scalia said in the Lujan case, talking about, you know, and also I think it was Judge Sentell in the dissent in Glickman talking about personal taste and how difficult it is to get into that matter. So for those reasons, I don't think that there is standing in this case. And we've litigated that from the very beginning. Assuming that the court should find standing, however, I think that the statutory construction that the appellants are urging makes no sense. In this case, the USDA has inspected this facility over a number of years, surprised inspections, and has never found anything that harms or injures the animals. And as a result, that's what sets the minimum standards. As Your Honor was saying with respect to subparagraph one, it defines what the minimum standards are that meet or exceed the Animal Welfare Act. And so what the plaintiffs are doing is trying to superimpose the Endangered Species Act to take priority over the minimum standards that have been set in the Animal Welfare Act. And I don't think that's appropriate when there's two separate statutes that are at play here. And I cited the supplemental authority just this week that I came across as I was preparing for the arguments of the Miami Seaquarium case, which has very similar facts and came out with a result. Obviously, it's a district court opinion, but it came out with results against the appellant's argument here. In that case, the argument was that the killer whales were in a tank that was too small. And as a result, that was causing harm and harassment to the animal. And the court found that that was not the case, that the standards are set by, in that case, the Marine Fisheries Association, just as in this case we have the standards set by the Animal Welfare Act, which understands and regulates the space requirement and the living conditions for the bears in question. And so once those standards are set, then that is all that's necessary for the bear zoo to comply with in order to satisfy the captive animal exception in the Endangered Species Act. Otherwise, it would make no sense to have that, and then we would end up just like we are here today with any time somebody wanted to file a claim against any zoo that they would just contend that, well, you're not following the standards that we think apply, and it's irrelevant what the government says, the Animal Welfare Act says, and therefore we can litigate against you over and over and over again, and I would contend that's what's happening here. And it gets back sort of to the issue of standing, which is that these plaintiffs, I would contend, and I understand it's a factual issue to a certain point, they individually couldn't recognize any of these four bears one from the other. They supposedly have this intense psychological attachment to these animals, but at trial they couldn't tell you which one was which. They don't know anything about bears, they'd only been to one other zoo in their lifetime, and that gets to the other issue of standing. If we talk about the three prongs of what's required, assume that there's injury. Both of the plaintiffs were unable to articulate when, if ever, they would revisit these bears. They had the same language that was a problem in Lujan about someday intentions to perhaps return at some unknown date in the future, and that's not sufficient. So that's not an actual or imminent harm that's required under the standing provision, under the first prong. Can I ask you, are there any species for which there is no AWA standard or provision, or does the AWA cover every species there is? I think my understanding is it covers all the species. The bears do not have a specific set of regulations, so they fall under other mammals. But there's no species for which there is just simply no AWA? Not that I'm aware of. And I would also say that with respect to the three exceptions, the first one dealing with the Animal Welfare Act, the Animal Welfare Act deals with, as Your Honor had said, the humane treatment of animals. The Endangered Species Act deals with depletion of habitat and depletion of the number of species that are endangered. That's the purpose of the Endangered Species Act. It's not to regulate captive animals. There's really nothing in the Endangered Species Act that has anything to do with the regulation of captive animals. That's the Animal Welfare Act. The Animal Welfare Act, as it says in the Sequarium case, I think in five separate places, talks about the humane treatment of captive animals. That's the intent. So what the appellants are trying to do here is piggyback the Endangered Species Act and sort of cloud out the Animal Welfare Act by saying that harassment means something different than the plain language of the statute. And again, if in this case, as Your Honor was saying, if in this case this Court finds, well, these zoological experts say that this is not generally accepted, well, where does that leave us? In the next case, other experts are going to say that zoological experts say that it's not generally accepted animal husbandry in the next case. And so each time the Federal Court will be involved in hearing expert testimony on what is and what is not sufficient square footage. That seems like it's sort of built into this regulation because apart from subsection 1, on subsection 2, say, breeding procedures, I don't know how we're going to figure out what generally accepted breeding procedures are, but apparently we're going to have to. There's no other way to read this. So the fact that generally accepted may raise some issues of proof and it may be a little bit vague, I think we're stuck with that as to 2 and 3 anyway. So I don't know how much mileage you can get out of that. Well, I think some mileage, Your Honor, because we're not dealing with the breeding or with veterinary care. Well, I know we're not in this case, but I'm saying this clearly the agency does anticipate that generally accepted by itself with no other objective standard can be applied because it's telling us we have to apply it to breeding procedures and veterinary care. I agree. And subsection 1, though, with the Animal Welfare Act, Animal Welfare Act, if the Court looks at sort of the scope of what it covers, it's covering facilities, sanitation, space, sufficient area to move around, etc., doesn't have anything to do with breeding or veterinary care. And so I think because of that, that's why subsection 1 speaks fully to the requirements that the Animal Welfare Act says if a bear has enough room to move around and sufficient for a captive animal under the regulations promulgated and enforced by the USDA, then that's sufficient. And that we don't go back in behind that as the plaintiff's expert in this case said, she just disagreed with the AWA minimum standard as to what a bear required. And so that to me is not an adequate basis to pursue the case when by all accounts, there's a compliance with the purpose of the AWA. There's sufficient space, ventilation, sanitation, etc. And the only violations that have ever been recorded against the bear zoo have been related to minor problems with, I think, a chipped floor and some other kind of maybe a fence or something like that. But if you look at the intent, I think, of the Endangered Species Act, and it talks about that in this aquarium case, which I thought was an excellent sort of analysis, it's requiring something more than just an incidental, perhaps, annoyance to an animal. It's something that should cause grave harm to an animal that's covered by the Endangered Species Act. Something more than just an incidental annoyance or inconvenience to an animal. And in this case, the bear zoo has always complied with the USDA regulations and whenever there's been a minor violation reported, it's been fixed. And so there's never been a problem with animal waste in the cages or improper veterinary care. And I think it's conceded by the plaintiffs that there is no evidence that these bears have ever been actually harmed or wounded. And these bears also are, I think, the two oldest bears are in their mid-20s and then the two younger bears are the offspring of those older bears, which is some fairly substantial evidence that these bears have been well cared for. Let me sort of jump quickly into a couple of the other points, or one of the other points. I did raise the issue of the discovery violation, which I think is a substantial issue in this case. Up until the time that Dr. Paulson gave her direct testimony during a Debenese deposition, there had never been a disclosure by the plaintiffs that Dr. Paulson would opine that these were grizzly bears. Previously in the report that had been submitted in discovery, she could not reach a conclusion to a reasonable degree of certainty that these were grizzly bears. And then suddenly during direct examination during a Debenese deposition, she suddenly opines that she believes based on these videos that now they are grizzly bears. And my contention is, on behalf of the defendants, it was impossible to meet that testimony. The ship had sailed with respect to obtaining expert testimony to rebut that opinion. And so we've contended from the very beginning that these were not, in fact, grizzly bears. And that was part of the trial. You advertised them as grizzly bears. Absolutely, yes, sir. And my response to that is they shouldn't have been advertised as grizzly bears, but the fact that you call something a grizzly bear does not make it, as a matter of law, a grizzly bear. And the plaintiffs had the burden, I would contend, to prove that they are grizzly bears, despite the advertisements in the public. And the district court found they met that burden. Yes, sir. Yes, sir. And if there's no other questions, I'll reserve the rest of my time for any further response. Thank you. Mr. Whitlock. Thank you. I wanted to briefly address Your Honor's point as far as the plain language of the exception and the fact that the court is stuck with the generally accepted language as to subsection 2 and 3. And I contended somewhat of a strained reading to say that in regards to subsections 2 and 3, but not subsection 1. And I think that, again, is played out by the plain language of the statute, because when you read it with the generally accepted colon, three subsections, generally accepted is the threshold requirement for each of the following three. And, in fact, and I contend fatally, the appellees freely conceded that point in their brief. At page 31, they noted, quote, unquote, to remove any possible ambiguity, you have to set out each of the three subsections with generally accepted at the beginning of each. And this is fully supported by the regulatory intent. Looking at the Federal Register Notice from September of 1998, the service stated, however, maintaining animals in inadequate conditions constitutes harassment, because such conditions might create the likelihood of injury, and the Act, the Endangered Species Act, continues to afford protection to listed species that are not being treated in a humane manner. And, again, I just think that if this definition of harassment doesn't apply to this case, if these pits, which all the evidence in this case, and, in fact, the judge conceded in the conclusion, are such inadequate conditions, which the service stated the Act continues to afford protection to, then what does it apply to? And to Mr. Melrose's point, the AWA does not have their specific regs. They're very basic. It covers food, water, and sanitation. Can I ask you the same question I asked your colleague? Sure. Are there any species for which there is just no Animal Welfare Act? There's not. It covers the, okay. Yeah, and that's why bears fall into this kind of catch-all. So there are general categories. Right. It's a catch-all. Bears are governed by the same regulations that govern giraffes, prairie dogs, zebras, for example. Other animals have more specific standards. Okay. And, in fact, what the evidence in this case demonstrated, an overwhelming preponderance, and, in fact, the district court's own findings support, is no different than the harassment that was recently found in the Kewl V. Selner case in the Northern District of Iowa, 2016. It's cited, I believe, in our reply brief. There the court found, based on expert testimony, that the Cricket Hollow Zoo had harassed both lemurs and tigers. And this harassment was based on social isolation in their housing, again, analogous to the pits, and on the lack of environmental enrichment, which, again, you have to look no further than the district court's own findings because the bear zoo didn't have any expert testimony on harassment. Their expert wasn't qualified to testify on it. It's no different than the Selner case where the court found harassment. And so that, and I believe, Your Honor, to your question earlier, that is the closest case that has come to construe this definition of harass. The Southern District of Florida case that Mr. Melrose discussed is plainly distinguishable because, in that case, NIMPS, which administers the act with regards to the killer whale at issue in that case, had not even promulgated a definition of harass. Here, the Fish and Wildlife Service has, and moreover, the Fish and Wildlife Service has addressed any conflict or relationship between the Endangered Species Act and the Animal Welfare Act by adding this exception. We've only talked about harassment here. What about harm? Well, Your Honor, and again, the evidence and the district court's findings support this court reversing the district court and entering judgment for the plaintiffs on harm as well. Harm, admittedly, is a higher standard, which is why I focused on harassment. Harm is an act which actually kills or injures wildlife. Exactly. Wildlife. Harassment requires an actual injury, or excuse me, harm, whereas harassment just requires the likelihood of injury. So where harm focuses more on an actual injury, harassment is more annoyance. Harassment is the significant disruption of normal behavioral patterns. All the evidence in this case and the district court's findings, these bears exhibit abnormal behavioral patterns as a result of being confined in these pits. They pace. Wait, I'm sorry. Did you say that harm is the significant impairment of essential behavioral patterns? No, I said harass. Harass. Okay, sorry. Harass. Yes. Harm is a higher standard. Yeah, harass. Harass is the significant disruption of normal behavioral patterns, which the evidence in this case showed that it was. So with that, I respectfully ask that the court reverse the district court's decision, enter judgment for the appellants, and remand this matter for the determination of an appropriate remedy. All right. Thank you, Mr. Melrose. Thank you. Let's follow up with just a couple of points, and I don't want to. Just briefly on the standing issue, with respect to the other prongs, set aside causation, redressability is at issue here as well. I mean, the question is, if in order for there to be standing, there has to be some redress. These plaintiffs don't have any intention of seeing these bears again, except at some indeterminate point in the future. And I quoted what the plaintiffs. Do they need to give you a date? I think the court said they'll go see the bears if they're in more humane conditions. So what else do we need? I think we need something more than that, because Lujan says that someday intentions are insufficient. And I think that they can't even quantify what would it take to trigger their willingness to go see the bears. And I think getting into that prong as well, the fact that they've never went back a second, third, or fourth time. Every other case that gets into standing for plaintiffs in a citizen suit talks about repeated visits, and these women didn't make more than the solitary visit and then filed a lawsuit. With respect to what the bottom line on the case and what the complaint is, there's no evidence that the bears were harmed, actually harmed, and the word actually is key in that definition, of course. The only thing that the plaintiffs could potentially point at was some hair loss and some stereotypic or pacing behavior, and the district court clearly found that that was not harm. And so I think we're bound by that determination as a factual basis. And so if you look at the harassment issue and getting into what Your Honor had asked about, Judge Bailey, with respect to in the wild, the Endangered Species Act focuses on not harassing wildlife. So, for example, I think you could use something like shining a spotlight on endangered species in the wild that when they were trying to socialize or breed or whatever, that would harass them, that would prevent them and disrupt their normal breeding patterns, or their normal behavior in the wild that would constitute harassment. The fact that they're in captivity obviously disrupts that anyway, and so that's why I think that there has to be something more than incidental behavior that the court found in this case was related to the mere fact of captivity. What's the strongest argument that these aren't grizzly bears, notwithstanding the zoo's public representations? The strongest argument, I think, I would say first is the discovery violation, that we never even got into that because the expert's opinion that was disclosed never said they were grizzly bears until the trial deposition, and so we never litigated that issue out. I think the plaintiff has the burden of proof to show that they are grizzly bears, and they never did that. They never conducted DNA testing, and they never presented a disclosure of an expert opinion that would allow the issue to be litigated during the trial. It was sprung at the last minute without an ability by the defendants to contest that point. Did the district court have time to get an expert? We did not ask for a continuance. I asked to exclude the expert's opinion, yes, sir. But you didn't ask for a continuance so you could get one? No, sir. I thought also it wasn't just the advertisements. Weren't there also representations made to inspectors? And I thought that the health certificates and the records for the bears identified them as grizzlies. They did. The district court relied on a lot of evidence in finding that they were grizzlies, most of it produced by the defendants themselves, right? I think, yes, the statements made by the defendants and by the veterinarian court. So your position is that the defendants were just lying the whole time. They advertised them falsely, they made false representations to inspectors, and they falsified the health certificates for the bears. And so the district court should have looked at none of that. I'm not saying the district court shouldn't have looked at it. It shouldn't have been sufficient to rely on all of these false records, which the defendants had compiled over a course of years. Absolutely. Doesn't that strike you as sort of an odd argument? Well, it's not odd in the sense that just because the defendants said – It seems like it would open your clients to some kind of liability. So they have been falsifying for years medical records, representations to USDA inspectors, not to mention the false advertising, and that's what they want to rest on in this court. Your Honor, I don't know if that would rise to the level of some other violation. I can simply say that they advertised them as grizzlies when, in fact, there's no direct – They lied to inspectors about what they were. I don't know that there's affirmative evidence that they said – The district court said they made representations to inspectors that they were grizzly bears. And if they did, there could be separate liability for that. But I'm just simply saying for this court – And also, the last thing, and if I could, Judge Floyd, to your point, the expert opinion that these were grizzly bears was a choice of two possibilities. It wasn't picking grizzly bears out of the universe of brown bears. It was, are these Eurasian bears or grizzly bears? The expert says, with just those two choices, I pick grizzly bears. But that's not sufficient. All right. Thank you, sir. Thank you, Your Honor.
judges: Henry F. Floyd, Pamela A. Harris, John Preston Bailey